NOT DESIGNATED FOR PUBLICATION

No. 119,455

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of R.C.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Lyon District Court; MERLIN G. WHEELER, judge. Opinion filed November 16, 2018. Affirmed.

*Brandy Roy-Bachman*, of Law Office of Brandy Roy-Bachman, of Emporia, for appellant natural father.

*Meghan K. Morgan*, assistant county attorney, and *Marc Goodman*, county attorney, for appellee.

Before POWELL, P.J., ATCHESON and GARDNER, JJ.

PER CURIAM: Father appeals the termination of his parental rights to his daughter, R.C. He argues that the district court's determination of unfitness was not supported by sufficient evidence and that the district court abused its discretion in determining that it was in R.C.'s best interest to terminate his parental rights. Finding no error, we affirm.

*Factual and procedural history*

J.C. (Father) is the natural father of R.C., born in 2005. Mother and Father lived separately at times relevant to this case. R.C. is moderately to profoundly intellectually disabled. She is 12 years old and in the sixth grade, but functions cognitively as a six year old and tests at a first or second grade level.

1

In April 2016, a petition alleging R.C. was a child in need of care was filed with the Lyon County District Court and R.C. was placed in the temporary custody of the Kansas Department for Children and Families (DCF). The district court adjudicated R.C. to be a child in need of care as defined by K.S.A. 38-2202(d)(2). At a permanency hearing in December 2017, the district court determined that reintegration was no longer a viable goal and directed the State to file a motion to terminate Father and Mother's parental rights.

In May 2018, the district court held a hearing on the State's motion for finding of unfitness and termination of parental rights. The court heard testimony from several service providers, R.C., R.C.'s foster mother, and one of Father's friends. It found both Mother and Father to be unfit and terminated their parental rights. Mother has not appealed, but Father appeals the district court's findings. We summarize the evidence below.

DCF has been involved with R.C. and Father since R.C. was young. R.C. was temporarily removed from the home as a baby in November 2005 due to medical neglect and was reintegrated with Father in February 2006. DCF also received reports concerning R.C. in 2008, 2009, 2010, 2011, 2013, 2014, and 2015, but DCF found no cause to remove her from Father's care. The family received family preservation services on and off throughout R.C.'s life. This time, DCF became involved when R.C. reported inappropriate sexual behavior from a brother, even though she has no siblings. Since then, R.C. consistently reported to social workers and her foster family that Father touched her inappropriately.

Aside from the allegations of sexual abuse, witnesses at the termination hearing testified about R.C.'s social, emotional, and intellectual limitations. R.C. has limited cognitive retention and she is "very much a follower" who is vulnerable and overly trusting. She is high energy and gets bored or antsy easily. R.C. "doesn't recognize

2

danger. She would get in a car with somebody she doesn't know if they had a puppy and never think twice about it." She has trouble communicating with both adults and other children and she has trouble expressing when she feels uncomfortable. Because of these traits, R.C. needs supervision at all times and was described as "a victim waiting for an incident to happen."

The district court also heard testimony about Father's mental capacity and his own intellectual disability. Father told Lynn Holliman, his social worker, that he was in a special education program as a child. His mental capacity was hindered even more after a work-related accident in the late 1970s that resulted in a traumatic brain injury that affects Father's memory and his ability to process information. Despite these limitations, Holliman described Father as one of the most consistent clients she has ever worked with. She saw him for therapy services for over two years, from May 2015 to September 2017, and he never missed an appointment and always dressed appropriately. Holliman testified that through therapy, Father has made progress with his anxiety and depression, his ability to undertake daily activities and projects, and setting boundaries. Throughout the case, Father never missed a visit with R.C., and often brought meals, treats, and small gifts for her. Even though Father was good about those parts of his case plan, Father had difficulty accepting or taking advantage of the services offered to him. For example, DCF offered Father family preservation services in 2016, but he declined services and said that his house was too small for people to come in. He also has fired service providers when he does not like their help or suggestions.

Holliman testified that Father has strong, positive feelings for R.C. and would like to continue parenting her. Still, others testified that Father's condition impedes his ability to care appropriately for R.C. Father understands R.C.'s basic needs, such as food and shelter, and understands that she has different needs than other children. But R.C. has many emotional needs, and Father struggles to provide for her in that way, and he cannot help her learn and develop in the ways that she is lacking. Williams testified that she does

3

not believe Father can meet R.C.'s heightened emotional needs because of his own developmental level. Father is aware of R.C.'s limitations, but cannot help her develop self-care skills. Williams testified that although parenting classes that cover topics such as the basic needs of children or children with behavioral problems are available, those classes cannot teach Father about the emotional care, affection, and bonding that R.C. needs.

R.C.'s emotional difficulties and need for supervision will not dissipate as she grows up. Brenda Long, R.C.'s foster mother, expressed concern about Father's ability to meet R.C.'s needs in an appropriate manner, especially as R.C. develops into a young woman.

Sara Pearson, the director of Community Developmental Disability Organization administration at Hetlinger Developmental Services, testified at the hearing. Pearson determines eligibility and manages the waiting list for home and community based services for qualifying individuals with intellectual or developmental disabilities. Father and R.C. are currently on the waiting list for services through Hetlinger. Although they have not received services from Hetlinger in the past, they have received case management services through several of Hetlinger's affiliates. These services have been sporadic though, because Father has a history of firing service providers. Both Father and R.C. will be eligible for personal assistant services when they come off of the waiting list, meaning an attendant care worker will be available for a maximum of eight hours per day to help them with daily tasks. Those services are unavailable overnight.

Gayle Baumgartel, a family friend who has known Father and R.C. for 11 years, also testified. Baumgartel generally saw Father and R.C. about twice a month for 11 years, and at one point lived with them for almost a month. She observed Father taking care of R.C., playing games with her, getting her ready for school, trying to read to her, cleaning his house, and preparing meals. Baumgartel testified that she believed Father

and R.C. were happy and that she was not concerned about R.C.'s safety. Baumgartel testified that she would be willing to help father with R.C. upon reintegration.

At the conclusion of evidence, the district court terminated Father's parental rights based on K.S.A. 2017 Supp. 38-2269(b)(1), (b)(2), (b)(4), and (b)(7). The district court found that R.C. had made repeated, consistent, and credible statements about Father's sexual abuse. Agencies had provided help, but Father's inability to recognize the need to provide for R.C.'s emotional care of R.C. left those services not fully utilized. The court found that Father had some mental deficiency rendering him unable to care for R.C.'s physical and emotional needs. Finally, the court found that termination was in R.C.'s best interest because R.C. needs almost constant supervision and Father is either unable or unwilling to engage in the changes necessary to provide those services to her. K.S.A. 2017 Supp. 38-2269 (g)(1).

Father appeals, raising two issues on appeal: that insufficient evidence supports the district court's finding that Father was unfit and that his unfitness was unlikely to change in the foreseeable future; and that the district court abused its discretion in determining that terminating his rights was in R.C.'s best interest.

*Governing Legal Principles*

We begin with some general principles governing proceedings under the Revised Kansas Act for Care of Children, K.S.A. 2017 Supp. 38-2201 *et seq.* A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-60, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. Accordingly, the State may extinguish the legal bonds between parent and

5

child only upon clear and convincing proof of parental unfitness. K.S.A. 2017 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

As provided in K.S.A. 2017 Supp. 38-2269(a), the State must prove the parent to be unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. K.S.A. 2017 Supp. 38-2269(b).

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State as the prevailing party, that a rational fact-finder could have found that decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. In short, any conflicts in evidence must be resolved to the State's benefit and against Father.

Having found unfitness, the district court must then determine whether termination of parental rights is "in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g)(1). The district court makes that determination based on a preponderance of the evidence. *In re R.S.*, 50 Kan. App. 2d at 1116. The best-interests issue is essentially entrusted to the district court acting within its sound judicial discretion. 50 Kan. App. 2d at 1115-16. An appellate court reviews those sorts of decisions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106; *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

6

*Sufficient evidence supports the district court's finding that Father was unfit and that his unfitness is unlikely to change in the foreseeable future*

K.S.A. 2017 Supp. 38-2269(b) and (c) provide a list of nonexclusive factors the court considers in determining unfitness. Any of the factors may establish grounds for the termination of parental rights. K.S.A. 2017 Supp. 38-2269(f). The district court based its termination of Father's parental rights on four factors: K.S.A. 2017 Supp. 38-2269(b)(1), emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child; K.S.A. 2017 Supp. 38-2269(b)(2), conduct toward a child of a physically, emotionally or sexually cruel or abusive nature; K.S.A. 2017 Supp. 38-2269(b)(4), physical, mental or emotional abuse or neglect or sexual abuse of a child; and K.S.A. 2017 Supp. 38-2269(b)(7), failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family.

We focus our analysis on the district court's finding that Father sexually abused R.C. We find that a reasonable person could find Father's sexual abuse of R.C. was proved by clear and convincing evidence, warranting termination of his parental rights. See K.S.A. 2017 Supp. 38-2269(b)(2) and K.S.A. 2017 Supp. 38-2269(b)(4). R.C. spontaneously reported to her foster parent and to her therapist that Father had sexually abused her and then gave relatively rudimentary descriptions of the abuse. R.C. said this on multiple occasions and described multiple instances of abuse. Although R.C. first said that the sexual contact came at the hands of a brother, her more recent allegations against Father were consistent and specific.

At the termination hearing, R.C. acknowledged Father had touched her private parts but did not elaborate and could not recall when it happened. But several service providers, as well as R.C.'s foster mother, testified to more detailed statements that R.C. had made out-of-court about such incidents. Jennifer Williams, R.C.'s therapist, testified

7

that R.C. voluntarily and consistently says "that [Father] put his private part into her private part." Williams said that R.C. has different ways of referring to the abuse. R.C. says "he . . . hurts my private parts, he touches my private parts, he uses his stick to hurt my private parts, and I don't like that, I told him no-no. . . . [H]e licks me there." When R.C. talks about the abuse with her foster mother, "she cries and shakes uncontrollably. She says it happens lots, not just one time, and it's basically that same story over and over."

R.C.'s behavior around Father was consistent with a victim of abuse. She testified that she enjoys spending time with Father and wants to visit him, but she does not want to spend the night with him. Long testified that R.C. "loves her dad, she wants to stay there, but she's afraid to sleep there" because he touches her inappropriately at night. When asked why she does not want to live with Father, R.C. references his sexual behavior.

Although Father maintains that the two have a strong bond, witnesses testified there is little interaction between them during his supervised visits. R.C. is hypervigilant, skittish, apprehensive, and anxious around Father. Williams, a therapist who interacted with R.C. and Father together four times for family therapy, testified that R.C. kept her distance from Father and remained across the room from him during their sessions. Similarly, Taryn Morris, a family support worker with St. Francis Community Services, testified that during Father's visits, R.C. and Father did not interact much and that R.C. preferred to speak to Morris or other familiar case workers instead of Father. Because R.C. is standoffish around Father and avoids being alone with him, someone stayed in the room with them at all times during visits. Even considering Father and R.C.'s mental capacities, Williams expected them to bond through play, but that was not the case. She testified that Father did not respond well to her encouragement and prompting for the two to interact. Despite prodding and attempts to redirect his behavior, Father would not get on the floor to play with R.C., and instead would act as if he could not hear what Williams was telling him. She described their therapy sessions as unsuccessful, and she

stopped conducting sessions with Father because he was unable to engage in the sessions in a therapeutic manner.

Father denied allegations of inappropriate behavior with R.C., suggesting that any touching may have been his bathing or otherwise appropriately caring for R.C. But any conflicts in evidence must be resolved to the State's benefit and against Father. DCF investigated and substantiated R.C.'s sexual abuse allegations against Father, and R.C. was not shown to have any motive or even ability to fabricate these allegations. The circumstances weigh heavily against her having made them up. R.C.'s description of some of the incidents could not be anything other than sexual abuse, and the district court chose to credit her descriptions, finding that Father had sexually abused R.C. in some manner more than once. We cannot revisit that credibility determination. *In re B.D.-Y.*, 286 Kan. at 705.

We find it unnecessary to address the remaining factors, although we agree they also show Father's unfitness. Instead, we ask whether Father's conduct is unlikely to change in the foreseeable future. See K.S.A. 2017 Supp. 38-2269(a). "The 'foreseeable future' should be viewed from the child's perspective, not the parents', as time perception of a child differs from that of an adult." *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008). Father's past conduct may be used as an indicator of his future behavior. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). Nothing in the record suggests that Father's conduct is likely to change. Father received individual and family therapy and support from local resources, yet still sexually abused R.C. and was unable to adequately parent her. The district court properly found that Father is unfit and that his conduct is unlikely to change in the foreseeable future.

*The district court did not abuse its discretion in determining that terminating Father's parental rights is in the best interest of R.C.*

Finally, a district court must determine whether termination of parental rights is in the best interests of the child. K.S.A. 2017 Supp. 38-2269(g)(1). The district court is in the best position to make findings on the best interests of the child, and we will not disturb its judgment unless we find the determination amounts to an abuse of judicial discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010).

Father argues that the court "failed to adequately look at all the evidence presented." He brings up the testimony that R.C. loves Father and wants to continue visits with him, that Father desired to continue parenting R.C., and that Father has a bond with R.C. Father also argues that no evidence was presented that R.C. was aware she had been sexually abused.

We are not persuaded by Father's arguments. Instead, we are convinced that the district court evaluated all of the testimony and evidence before determining that it is in R.C.'s best interest that Father's rights are terminated. In finding that terminating Father's parental rights was in R.C.'s best interests, the district court observed R.C. has heightened emotional needs because of her intellectual disability, needs almost constant supervision, and was sexually abused by Father.

R.C. is not safe around Father because of his sexual abuse. Reasonable people could agree with the district court that terminating Father's rights is in R.C.'s best interest. The State has shown by clear and convincing evidence that Father is unfit, that Father's circumstances are unlikely to change in the foreseeable future, and that it is in R.C.'s best interests that we terminate Father's parental rights.

Affirmed.